# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| ROLA HAMANDI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:07-CV-2153 (ESH) |
| | ) |
| | ) |
| MICHAEL CHERTOFF, Director, | ) |
| U.S. Department of Homeland Security, et al., | ) |
| | ) |
| Defendants. | ) |

_____)

## MOTION TO DISMISS

Defendants, by and through their attorney, the United States Attorney for the District of

Columbia, respectfully move this Court to dismiss this case, pursuant to Fed. R. Civ. P. 12(b)(1),

for lack of subject matter jurisdiction.  This motion is based on the accompanying Memorandum

of Points and Authorities and supporting exhibits.  A proposed Order is also attached.

Dated: March 12, 2008          Respectfully submitted,

            /s/
_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


            /s/
_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney.


            /s/ Robin M. Meriweather
_____
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198
Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov
UNITED STATES DISTRICT COURT

**FOR THE DISTRICT OF COLUMBIA**

_____

|                                              |     |                                      |
|----------------------------------------------|-----|--------------------------------------|
| **ROLA HAMANDI,**                            | )   |                                      |
|                                              | )   |                                      |
| **Plaintiff,**                               | )   |                                      |
|                                              | )   |                                      |
| **v.**                                       | )   | **Civil Action No. 1:07-CV-2153 (ESH)** |
|                                              | )   |                                      |
|                                              | )   |                                      |
| **MICHAEL CHERTOFF, Director,**              | )   |                                      |
| **U.S. Department of Homeland Security, et al.,** | )   |                                      |
|                                              | )   |                                      |
| **Defendants.**                              | )   |                                      |

_____ )

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**INTRODUCTION AND SUMMARY**

Plaintiff Rola Hamandi submitted a naturalization application July 31, 2006, and seeks an order from this Court compelling Defendant United States Citizenship and Immigration Services ("USCIS") to complete its adjudication of that application. See Petition for Writ of Mandamus ¶ 10 (hereafter "Compl."). The Court lacks jurisdiction to review Plaintiff's claims. Pursuant to the Immigration and Naturalization Act ("INA"), federal district courts are authorized to review USCIS's adjudication of a naturalization application if 120 days have passed since the applicant was "examined." 8 U.S.C. § 1447(b). In accordance with its regulations, USCIS has not yet scheduled Plaintiff's naturalization interview, because her name checks are not complete. See Petition ¶ 7; 8 C.F.R. § 335.2(b). Therefore, Plaintiff has not been "examined," and cannot obtain judicial review pursuant to Section 1447(b) of the INA.

The Mandamus Act and the Administrative Procedure Act do not provide an alternative source of jurisdiction, because those statutes' general jurisdictional grants cannot trump the

1

specific requirements for judicial review that Congress established in INA Section 1447(b). The INA clearly reflects Congress's intent that district court jurisdiction be limited to cases in which 120 days have passed since the applicant's examination and no final action has been taken on the application. Plaintiff should not be permitted to circumvent those limitations by filing suit under the APA or Mandamus Act.

Moreover, there is no mandamus or APA jurisdiction because USCIS has no nondiscretionary duty to adjudicate a naturalization application before an applicant has been examined. To the contrary, both the INA and USCIS regulations expressly preclude USCIS from doing so. Congress did not specify any time frame within which USCIS must conduct an interview and examination. USCIS regulations require that the interview and examination occur only after all FBI background checks are completed. It is undisputed that the background checks remain pending. Thus, by seeking judicial intervention at this stage of the adjudicative and investigative process, Plaintiff seeks to compel Defendants to take actions they have no legal duty to perform, and which are precluded by federal regulations. Neither the APA nor the Mandamus Act provide jurisdiction to compel such relief.

## **BACKGROUND**

### A.    **Statutory and Regulatory Framework**

Prior to 1990, federal district courts sat as naturalization courts and were vested with exclusive jurisdiction to review an applicant's eligibility for naturalization and to naturalize aliens as citizens of the United States. In 1990, Congress enacted the Immigration Act of 1990, which overhauled the naturalization process. See Pub. L. No. 101-649, § 401, 104 Stat. 4978 (1990). That statute transferred the power to naturalize from the district courts to the Attorney

2

General, giving the Attorney General  — and now the Secretary of the Department of Homeland Security — "sole authority to naturalize persons as citizens fo the United States." 8 U.S.C. § 1421(a).  If USCIS denies a naturalization application, the applicant may seek administrative review of that denial, and subsequently may seek de novo review of her/his eligibility in a federal district court.  See id. §§ 1447(a); 1421(c); 8 C.F.R. § 336.2(b).

Before USCIS can adjudicate a naturalization application, a full background investigation of the applicant must be completed.  In 1997, Congress mandated that the former INS "receiv[e] confirmation from the Federal Bureau of Investigation ("FBI") that a full criminal background check has been completed" prior to adjudication of naturalization applications.  Pub. L. No. 105-119, 111 Stat. 2448 (Nov. 26, 1997).  Consistent with that mandate, the relevant statutory and regulatory provisions require the Executive Branch to thoroughly investigate the background of every applicant for citizenship in order to determine whether that applicant is eligible to be naturalized.  See 8 U.S.C. § 1446(a); 8 C.F.R. § 335.1.

To be eligible for naturalization, an applicant must demonstrate, inter alia, that  "she has been a person of good moral character. . . for a period of not less than five years immediately preceding the date of filing an application for naturalization."  8 U.S.C. § 1435(b).  The results of a background check are an important means of appraising an alien's moral character.  USCIS conducts several forms of security and background checks to ensure that citizenship applicants are not a risk to national security or public safety.  See Declaration of Joyce A. Brown, ¶ 9 (Exh. 1 hereto).  Those security investigations may reveal significant derogatory information pertaining to the applicant's eligibility to receive immigration benefits.  See id. ¶ 11.

During the adjudication process, USCIS also conducts an interview of naturalization applicants. <u>See</u> 8 U.S.C. § 1446(b); 8 C.F.R. § 335.2(a). That interview can occur "only after the Service has received a definitive response from the Federal Bureau of Investigation that a full criminal background check of an applicant has been completed." 8 C.F.R. § 335.2(b); <u>see</u> <u>also</u> Brown Decl. ¶ 10. USCIS notifies applicants to appear for that initial examination after it receives the results of the FBI's background check. <u>See</u> 8 C.F.R. § 335.2(b).

**B.    Plaintiff's Application**

Plaintiff Rola Hamandi is a native and citizen of Lebanon who filed a naturalization application on or about July 31, 2006. Compl. ¶¶ 1, 6. USCIS requested that the FBI perform name checks on May 22, 2006, and those name checks remain pending. <u>See</u> Brown Decl. ¶6 ; Declaration of Michael A. Cannon, ¶ 41 (Exh. 2 hereto). In accordance with its regulations, USCIS cannot schedule Plaintiff's naturalization interview until it has received the results of the FBI name check. <u>See</u> Brown Decl. ¶ 14. USCIS will schedule Plaintiff's naturalization interview upon receipt of the results of the name check results from the FBI, provided that the name check clears with a "no record" response. <u>See</u> <u>id.</u> While her naturalization application remains pending, Plaintiff retains the benefits of her status as a permanent resident of the United States, including the right to live and work in this country and to travel freely abroad. <u>See</u> <u>id.</u> ¶ 16.

## <u>STANDARD OF REVIEW</u>

Defendants move for dismissal under Rule 12(b)(1) because the Court lacks subject matter jurisdiction to review Plaintiff's claim. <u>See</u> Fed. R. Civ. P. 12(b)(1). When reviewing a 12(b)(1) motion to dismiss, "the court must accept the complaint's well-pled factual allegations

as true and draw all reasonable inferences in the plaintiff's favor." Thompson v. Capitol Police Bd., 120 F. Supp.2d 78, 81 (D.D.C. 2000) (citations omitted); see also Vanover v. Hantman, 77 F. Supp.2d 91, 98 (D.D.C. 1999). "The court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." Rann v. Chao, 154 F. Supp. 2d 61, 64 (D.D.C. 2001), aff'd, 346 F.3d 192 (D.C. Cir. 2003). In addition, plaintiffs bear the burden of persuasion, and must establish subject-matter jurisdiction "by a preponderance of the evidence." Thompson, 120 F. Supp.2d at 81; Vanover, 77 F. Supp.2d at 98. To determine the existence of jurisdiction, a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence. See Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992); Rann, 154 F. Supp. at 64.

## ARGUMENT

**I.      28 U.S.C. § 1447(b) IS THE EXCLUSIVE REMEDY FOR PLAINTIFF TO CHALLENGE DELAY IN ADJUDICATING A NATURALIZATION APPLICATION AND PLAINTIFF HAS NOT MET THE CONDITIONS FOR 1447(b) JURISDICTION.**

It is settled that the United States, as sovereign, "is immune from suit save as it consents to be sued, and the terms of consent to be sued in any court define that court's jurisdiction to entertain the suit." United States v. Sherwood, 312 U.S. 584, 586 (1941); see also United States v. Orleans, 425 U.S. 807 (1976); United States v. Testan, 424 U.S. 392, 399 (1976) ("except as Congress has consented to a cause of action against the United States, 'there is no jurisdiction . . . to entertain suits against the United States'") (quoting Sherwood, 312 U.S. at 587-88). Thus, a waiver of sovereign immunity is a jurisdictional prerequisite to maintaining a lawsuit against the federal government. See United States v. Mitchell, 463 U.S. 206 (1983); United States v. Shaw,

309 U.S. 495, 500-01 (1940) (the United States is immune from suit unless it has expressly waived sovereign immunity and consented to be sued).  Where the federal government waives its immunity from suit, statutory "limitations and conditions upon which the Government consents to be sued must be strictly observed, and exceptions thereto are not to be implied."  Lehman v. Nakshian, 453 U.S. 156, 160-61 (1981) ("a waiver of [sovereign] immunity . . . must be 'unequivocally expressed'"); see also United States v. Nordic Village, 503 U.S. 30, 33-34 (1992); United States v. King, 395 U.S. 1, 4 (1969).  Such waivers are construed "strictly in favor of the sovereign."  Library of Congress v. Shaw, 478 U.S. 310, 318 (1986); King, 395 U.S. at 4; United States v. Erika, Inc., 456 U.S. 201, 206 n.6 (1982).

A party bringing suit against the United States bears the burden to prove that the government has unequivocally waived its immunity.  See Sherwood, 312 U.S. at 586; Interstate Bank Dallas, N.A., v. United States, 769 F.2d 299, 303 (5th Cir. 1985); Cominotto v. United States, 802 F.2d 1127, 1129 (9th Cir. 1986); Cole v. United States, 657 F.2d 107, 109 (7th Cir.), cert. denied, 454 U.S. 1083 (1981).  In addition, "[o]n a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of persuasion to establish subject-matter jurisdiction by a preponderance of the evidence."  Thompson v. Capitol Police Board, 120 F. Supp. 2d 78, 81 (D.D.C. 2000).   Plaintiff cannot carry that burden in this case.

The Immigration and Nationality Act ("INA") contains the waiver of immunity that allows certain individuals to challenge delays in adjudicating their naturalization applications.  Specifically, federal district courts are authorized to review USCIS's adjudication of a naturalization application if 120 days have passed since the "the date on which the examination is conducted" in connection with the naturalization application.  8 U.S.C. § 1447(b).  The INA

contemplates that an "examination" will include taking testimony concerning the applicant's admissibility as a U.S. citizen. Id. § 1446(b). Plaintiff has not yet been "examined" because, as Plaintiff concedes, her interview and test for language skills and knowledge of U.S. history and culture have not yet taken place. See, e.g., Badier v. Gonzales, 475 F. Supp. 2d 1294, 1297-98 (N.D. Ga. 2006); Yan v. Mueller, 2007 WL 1521732, at *6 (S.D. Tex. May 24, 2007); see generally Compl. ¶ 7 (alleging that the interview and tests have not been scheduled). Accordingly, she has not met the conditions that Section 1447(b) places upon district court review of claims seeking to compel USCIS to complete its adjudication of a naturalization application.

Perhaps anticipating that Defendants would argue that she does not meet the conditions for Section 1447(b) review, Plaintiff attempts to rely on other statutory provisions as a source of jurisdiction and the requisite waiver of immunity— 8 U.S.C. § 1329, 28 U.S.C. §§1331 and 1361, and 5 U.S.C. § 704. Compl. ¶ 2. 8 U.S.C. Section 1329 does not confer jurisdiction, or a waiver of immunity, because it applies only to affirmative litigation brought by the government. See Bruno v. Albright, 197 F.3d 1153, 1162 (D.C. Cir. 1999) (explaining scope of Section 1329). Specifically, it gives district courts jurisdiction to review "all causes, civil and criminal, brought by the United States that arise under the provisions of this subchapter." 8 U.S.C. § 1329 (emphasis added). 28 U.S.C. Sections 1331 and 1361 do not independently waive sovereign immunity. See Swan v. Clinton, 100 F.3d 973, 981 (D.C. Cir. 1996); Buaiz v. United States, 471 F. Supp. 2d 129, 138 (D.D.C. 2007). Instead, those statutes provide a potential basis for subject matter jurisdiction in federal court if another statute contains the requisite waiver of immunity. Section 702 of the APA, waives immunity for certain challenges to agency actions if another

statute provides jurisdiction. See Califano v. Sanders, 430 U.S. 99, 107 (1977). However, the "general cause of action" created by the APA does not apply if another statute "preclude[s] judicial review." Block v. Community Nutrition Inst., 467 U.S. 340, 345 (1984). Here, Section 1447(b) precludes judicial review of Plaintiff's claim, because it limits federal district court jurisdiction to cases in which more than 120 days have passed since the naturalization applicant was "examined." 8 U.S.C. § 1447(b).

Recognizing Section 1447(b) as the exclusive remedy for claims challenging delay in adjudicating a naturalization application would be consistent with the broader tenet that where Congress has provided a specific waiver of sovereign immunity and/or grant of jurisdiction, and has limited the circumstances in which it may be invoked, a party cannot use a general waiver of immunity or jurisdictional grant to circumvent those limitations. See United States v. Fausto, 484 U.S. 439, 447-50, 108 S.Ct. 668, 673-75, 98 L.Ed.2d 830 (1988) (Civil Service Reform Act's denial of administrative and judicial review for adverse personnel actions to nonpreference eligibles precludes judicial review of those decisions by Claims Court under more general jurisdictional grant); United States v. Erika, Inc., 456 U.S. 201, 208 (1982) (Medicare statute's failure to provide for judicial review of benefits payable decision precludes Court of Claims from having jurisdiction under its general jurisdictional grant). In Danilov v. Aguirre, the Eastern District of Virginia held that the APA and the Mandamus Act did not confer jurisdiction over a complaint which, like Plaintiff's, sought to compel USCIS to complete its adjudication of a naturalization application prior to the applicant's "examination."[1] 370 F. Supp. 2d 441, 445

---

[1] The Danilov court concluded that the "examination" includes both the interview and the FBI background checks, and rejected the plaintiff's argument that the interview completed the "examination." Danilov, 370 F. Supp. 2d at 443-44. Other courts have agreed that the

(E.D.V.A. 2005). The <u>Danilov</u> court relied upon the "well settled" principle "that general grants of jurisdiction may not be relied upon to expand a very specific statute that either grants or limits jurisdiction." <u>Id.</u>

Although courts in this District have not yet addressed this jurisdictional question, a similar issue frequently arises when a statute provides that agency actions can be challenged in a federal court of appeals when certain conditions have been met, and a litigant instead brings an APA claim in the district court. In those cases, district courts have dismissed the actions for lack of jurisdiction, reasoning that the litigants cannot use the APA as an end run around more specific statutory grants of jurisdiction. <u>See, e.g.,</u> <u>John Doe, Inc. v. Gonzalez</u>, 2006 WL 18056865, at *21 (D.D.C. June 29, 2006) (dismissing case and citing precedent in which courts have "refused to allow litigants to circumvent clear statutory directives requiring direct petition to the courts of appeals" by invoking federal question jurisdiction in district court); <u>City of Tacoma, Washington v. National Marine Fisheries Serv.</u>, 383 F. Supp. 2d 89, 92 (D.D.C. 2005) ("It is well established that when two jurisdictional statutes provide different avenues for judicial review, courts apply the more specific legislation."); <u>National Council for Defense, Inc. v. United States</u>, 827 F. Supp. 2d 794 (D.D.C. 1993) (concluding that specific delegation of jurisdiction over certain constitutional challenges to NAFTA precluded district court jurisdiction under the APA and federal question jurisdiction). The same principles apply here.

---

"examination," as that term is employed by the statute, refers to the entire process, including all facets of the background investigation. <u>See, e.g.,</u> <u>El Kassemi v. Department of Homeland Sec.</u>, 2006 WL 2938819, at *1 (D.N.J. Oct. 13, 2006); <u>Damra v. Chertoff</u>, 2006 WL 1786246, at *1 (N.D.Ohio Jun 23, 2006); <u>El Kassemi v. Department of Homeland Sec.</u>, 2006 WL 2938819, at *1 (D.N.J. Oct. 13, 2006); <u>Martinez v. Gonzales</u>, 463 F.Supp.2d 569 (E.D. Va. 2006). This Court need not reach that issue, because Plaintiff had not been interviewed.

## II.     THERE IS NO MANDAMUS OR APA JURISDICTION BECAUSE DEFENDANTS HAVE NO CLEAR NONDISCRETIONARY DUTY TO COMPLETE THEIR ADJUDICATION OF PLANTIFF'S APPLICATION PRIOR TO HER INTERVIEW OR TO INTERVIEW HER AT THIS TIME.

### A.     There is No APA Jurisdiction Because There Has Been No "Final" Action And USCIS Has No Legal Duty to Perform the Actions Plaintiff Seeks to Compel.

As noted supra, the APA operates in tandem with federal question jurisdiction under 28 U.S.C. § 1331 to permit courts to review challenges to certain agency actions. See Califano, 430 U.S. at 107; Galluci v. Chao, 374 F. Supp. 2d 121, 128 (D.D.C. 2005). Section 704 of the APA, which Plaintiff cites, permits courts to review "final agency action," and to review related "preliminary, procedural, or intermediate agency action" at the time the final action is reviewed. 5 U.S.C. § 704. Section 704 does not apply to this case, because there has been no final action on Plaintiff's application. To be "final" for purposes of Section 704, an agency action "must mark the consummation of the agency's decisionmaking process — it must not be of a merely tentative or interlocutory nature." Bennett v. Spear, 520 U.S. 154, 177-78 (1997). Plaintiff does not contend that USCIS has made a "final" ruling on her naturalization application with which she disagrees. Instead, she alleges that Defendants "ha[ve] failed to take any action." Compl. ¶ 21. It follows that there is no jurisdiction under Section 704.

An agency's alleged failure to act is "sometimes remediable under the APA, but not always." Norton v. So. Utah Wilderness Alliance, 542 U.S. 51, 55 (2004). Section 706(1) permits claims for 'unreasonable delay' to "proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." Id. at 64; see also Orlov v. Howard, 523 F. Supp. 2d 30, 37 (D.D.C. 2007) (same). If the agency has no such duty, there is no APA jurisdiction. See Orlov, 523 F. Supp. 2d at 37.

10

The limits on APA jurisdiction recognized in <u>Norton</u> dispose of any APA claims for unreasonable delay. There, the Court addressed, <u>inter alia</u>, the language in 5 U.S.C. §706(1), which provides that a reviewing court "shall . . . compel agency action unlawfully withheld or unreasonably delayed." 524 U.S. at 62. The Court noted, with emphasis, that "the only agency action that can be compelled under the APA is action legally <u>required</u>." 524 U.S. at 63 (emphasis in original). The Court reasoned that the APA simply extended the traditional practice, prior to its passage, of achieving judicial review through a writ of mandamus, and that the mandamus remedy was normally confined to enforcement of "'a specific, unequivocal command.'" <u>Id.</u> (quoting <u>ICC v. New York, N.H. & H.R. Co.</u>, 287 U.S. 178, 204 (1932) and citing <u>Kendall v. United States ex rel. Stokes,</u> 12 Pet. 524, 613 (1838) ("precise, definite act . . . about which [an official] had no discretion whatsoever")); <u>accord</u> <u>Vermont Yankee Nuclear Power Corp. v. Nat. Res. Defense Council, Inc.</u>, 435 U.S. 519, 546 (1978) (§706[1] empowers a court only to compel an agency "to perform a ministerial or non-discretionary act"). The Court added that "a delay cannot be unreasonable with respect to action that is not required." 524 U.S. at 63 n.1.

In sum, a claim under Section 706(1) can go forward only "where a Petitioner asserts that an agency failed to take a <u>discrete</u> agency action that it is <u>required</u> to take." <u>Norton</u>, 524 U.S. at 64 (emphasis original). Thus, under <u>Norton</u>, Plaintiff cannot establish APA jurisdiction unless she demonstrates that USCIS has a non-discretionary duty to complete the adjudication of her naturalization application when she has not been "examined" and her background check results have not been received. Plaintiff can identify no such duty. Congress has made background checks a prerequisite to the grant of a naturalization application. <u>See</u> 8 U.S.C. § 1446(a).

11

Further, no naturalization application can be granted prior to the examination of the applicant. See 8 U.S.C. § 1446(b). As noted supra, USCIS regulations preclude it from interviewing Plaintiff before it has received the results of those name checks; thus Plaintiff has not yet been "examined." See 8 C.F.R. § 335.2(b). Plaintiff concedes that the name checks are not yet complete. Thus, USCIS has no "clear non-discretionary duty" to move forward on the adjudication of Plaintiff's application. Instead, completing the adjudication now would violate the express terms of USCIS's regulations and the INA.

In a case which is factually indistinguishable from the matter at hand, the United States District Court for the Northern District of Georgia dismissed a complaint seeking to compel USCIS to complete the adjudication of Plaintiff's naturalization application for lack of subject matter jurisdiction. See Badier, 475 F. Supp. 2d at 1297-99. There, as here, the plaintiff alleged that the immigration service had failed to act on his application for naturalization, and cited the APA and the INA as a source of jurisdiction. Id. at 1297. The court rejected Petitioner's jurisdictional allegations. Citing Norton, it reasoned that Section 706(1), the language of which is "mirrored" in Section 555(b), empowers the court to compel an agency to act, but only where the agency is required to perform a discrete ministerial or non-discretionary duty. USCIS had no such duty, because there was no statutorily prescribed time period within which the agency must act on an application for naturalization. Id. at 1298-1299.

Similarly, in Omar v. Mueller, 501 F. Supp. 2d 636 (D.N.J. 2007), the United States District Court for the District of New Jersey concluded that the APA did not provide jurisdiction to review the plaintiff's allegation that Defendants had unreasonably delayed adjudicating his naturalization application. Like Ms. Hamandi, Omar had not been interviewed because his

12

background check results were not complete.  See id. at 638-39.  The court noted that the Norton

limitation of judicial review "'to required agency action rules out judicial direction of even

discrete agency action that is not demanded by law.'"  Id. at 641 (quoting Norton, 542 U.S. at

65).  Omar's claims "d[id] not, and cannot, arise under the APA," because they sought to compel

action that was not required.  In this context,

> the USCIS is not required to process a naturalization application or conduct an
> interview within a certain time period.  Indeed, regulations prohibit it from
> conducting the required examination before the background check is complete.

Id. at 640.  Courts in other districts have reached the same conclusion.  See, e.g., Dorta v.

Gonzales, 2008 WL 131206, at *1 (S.D. Fla. Jan. 10, 2008) (holding same); Ahmed v. Mueller,

2007 WL 2726250, at *5 - *6 (E.D. Pa. Sep. 14, 2007) (finding no APA jurisdiction to review

Plaintiff's challenge to pace of adjudicating naturalization application where application had

been pending 17 months and interview had not been scheduled because background checks were

not complete); Al Gadi Gadi v. Chertoff, 2007 WL 1140825, at *5  (E.D. Cal. Apr. 17, 2007)

(concluding APA claims failed because plaintiff "is requesting that this Court order USCIS to

take an action it is not yet required to take").

**B.    There Is No Mandamus Jurisdiction For Similar Reasons.**

The Mandamus Act also does not confer subject matter jurisdiction to review Plaintiff's claims.  That statute gives district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.   The writ of mandamus is "a drastic and extraordinary remedy reserved for really extraordinary causes."  Cheney v. United States District Court, 542 U.S. 367, 380 (2004) (internal quotations and citation omitted); accord Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980).  District courts may issue a writ of mandamus only if three elements are met: "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff."  In re Medicare Reimbursement Litigation, 414 F.3d 7, 10 (D.C. Cir. 2005); see also Heckler v. Ringer, 466 U.S. 602, 616 (1984) (noting that defendant must owe plaintiff "a clear nondiscretionary duty" and that all other remedies must be exhausted).  Even when those factors are present, "a court may grant relief only when it finds 'compelling equitable grounds.'"  In re Medicare Reimbursement Litigation, 414 F.3d at 10.  The Court's decision whether or not to exercise mandamus jurisdiction is discretionary.  Public Citizen v. Kantor, 864 F. Supp. 208 (D.D.C. 1994).

There is no mandamus jurisdiction for substantially the same reasons that Plaintiff cannot establish jurisdiction under Section 706(1) of the APA.  USCIS has no "clear duty" to complete the adjudication of Plaintiff's naturalization application, because her name check results have not been received and she has not yet been examined.  Instead, its regulations preclude the scheduling of an examination at this time, and the INA precludes the approval of a naturalization

14

application prior to the examination.  <u>See</u> 8 C.F.R. § 335.2(b); 8 U.S.C. § 1446(b).  For the same reasons, Plaintiff has no "clear right to relief."  The absence of any such duty or right forecloses mandamus jurisdiction.  <u>See generally In re Medicare Reimbursement Litigation</u>, 414 F.3d at 10; <u>Orlov</u>, 523 F. Supp. 2d at 38 ("[T]he act sought to be compelled must be a clear nondiscretionary duty").

Although the D.C. Circuit has not addressed this precise jurisdictional issue, district judges in other jurisdictions have concluded that they lack mandamus jurisdiction to review claims factually indistinguishable from Plaintiff's.  <u>See, e.g.</u>, <u>Badier</u>, 475 F. Supp. 2d at 1298-99 (finding no mandamus jurisdiction to review action to compel USCIS to complete adjudication of naturalization application); <u>Al Gadi Gadi</u>, 2007 WL 1140825, at *5  (concluding mandamus and APA claims failed because plaintiff "is requesting that this Court order USCIS to take an action it is not yet required to take"); <u>Dorta</u>, 2008 WL 131206, at *1(agreeing with <u>Badier</u>); <u>Yan</u>, 2007 WL 1421732, at *6 (concluding there was no mandamus jurisdiction where plaintiff had been interviewed but naturalization application remained pending due to incomplete background checks).  Moreover, judges in this District have reached similar conclusions in mandamus actions seeking to compel USCIS to complete its adjudication of an adjustment of status application.  <u>See Orlov</u>, 523 F. Supp. 2d at 37; <u>Luo v. Keisler</u>, 521 F. Supp. 2d 72, 74 n.4 (D.D.C. 2007).  In sum, mandamus is an extraordinary remedy which is not available in these circumstances.  To the extent Plaintiff may be frustrated that her application remains pending, her complaint "is better addressed to the political branches."  <u>Ahmed</u>, 2007 WL 2726250, at *6 n.3.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants move that this case be DISMISSED for lack of

jurisdiction.

Dated: March 12, 2008                  Respectfully submitted,

                        _____/s/_____
                        JEFFREY A. TAYLOR, D.C. BAR # 498610
                        United States Attorney

                        _____/s/_____
                        RUDOLPH CONTRERAS, D.C. BAR # 434122
                        Assistant United States Attorney.

                        _____/s/_____
                        ROBIN M. MERIWEATHER, D.C. Bar. # 490114
                        Assistant United States Attorney
                        555 Fourth St., N.W.
                        Washington, D.C.  20530
                        Phone: (202) 514-7198
                        Fax: (202) 514-8780
                        Robin.Meriweather2@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
**ROLA HAMANDI,**                         )
                                          )
            **Plaintiff,**                )
                                          )
        **v.**                            ) **Civil Action No. 1:07-CV-2153 (ESH)**
                                          )
                                          )
**MICHAEL CHERTOFF, Director,**           )
**U.S. Department of Homeland Security, et al.,** )
                                          )
            **Defendants.**               )
_____)

### ORDER

Upon consideration of Defendants' Motion to Dismiss, it is this _____ day of

_____, 2008,


ORDERED  that Defendants' Motion to Dismiss be and hereby is GRANTED;

it is further ORDERED that this case be and hereby is DISMISSED.

                    SO ORDERED.


                    _____
                    United States District Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

Rola Hamandi
      Petitioner

v.                                Civil Action: 1:07-2153-ESH

Michael Chertoff
Secretary, U.S. Department
Of Homeland Security

Emilio T. Gonzalez, Ph.D.
Director, U.S.Citizenship &
Immigration Services

Robert S. Mueller, Director
Federal Bureau of Investigation,

      Respondents

### DECLARATION OF JOYCE A. BROWN

    I, Joyce A. Brown, the undersigned Senior Adjudications Officer of the Texas Service

Center, United States Citizenship and Immigration Services, pursuant to 28 U.S.C. § 1746,

declare the following:

1. I am employed by the United States Citizenship and Immigration Services (USCIS) as a

    Supervisory Center Adjudications Officer (SCAO), at the Texas Service Center (TSC) in

    Dallas, Texas. It is in this official capacity and based upon personal knowledge, review of

    relevant records, paper and electronic, and information discovered in the course of my

    official duties, that I provide this declaration.

2. I have been employed as an SCAO since May 1996 and have been employed in other

    capacities by the agency since February 1992. I am currently the supervisor of the

    Application for Naturalization (N-400) unit which is responsible for overseeing the intake

Declaration of Joyce A. Brown  1        Case No.: 07-cv-02153, District of Columbia

processing of the N-400 from initial receipt of the application by the TSC through the receipt of Federal Bureau of Investigation (FBI) name check clearances and scheduling the naturalization examination or interview in the USCIS district or field office where the applicant resides. As Supervisor of the N-400 unit at TSC, I manage the team that monitors and oversees the intake processing of the N-400 involved in this litigation. Most of the actual work my unit oversees is done by contractor personnel.

3. During fiscal year 2007, the N-400 section oversaw the initial receipt by TSC of 217,041 N-400 applications and the completion of processing on 121,166 N-400 cases.

4. Petitioner, Rola Hamandi, born on 11/2/1970 is a native and citizen of Lebanon whose status was adjusted to that of a Lawful Permanent Resident (LPR) of the United States on 10/22/2001, and who filed an N-400 with the TSC on 07/31/2006. On 08/29/2006, the TSC requested the FBI name check for plaintiff's N-400. As of today's date, the name-check for the plaintiff remains pending with the FBI. The FBI fingerprints on the plaintiff were last processed on 08/30/2006. The FBI fingerprint checks remain valid for a period of 15 months after they have been processed by the FBI. Because the fingerprint check expired on 11/30/2007, a new fingerprint appointment has been requested of petitioner.

5. Once USCIS receives an N-400 application, a file is opened and an electronic record of that application is created. Much of this initial electronic processing and data entry is automated, including the automatic generation and electronic transmission of a FBI name check request in FBIQUERY, the FBI repository and tracking system for FBI name check requests. Once the initial file creation and processing of an N-400 is complete, each file is routinely monitored for the status of the background checks.

6. Initially, the TSC runs a weekly electronic report in USCIS' FBIQUERY system for all files pending name check responses from the FBI to confirm the successful transmission of the FBI name check request and to identify those applications that have received responses from the FBI name checks and FD-258 (fingerprints) and are thus ready to schedule for examination by the District offices. FBI name check requests that have been received by the FBI but have not yet been completed are indicated by a notation of "Pending" in

Declaration of Joyce A. Brown  2          Case No.: 07-cv-02153, District of Columbia

FBIQUERY. An FBI name check that has been completed will be indicated by various entries depending on the result, including "No Record," "Positive Record," etc.

7. This report will also identify those N-400s that have received a "No Data" or "Error" response in FBIQUERY indicating a problem with transmission of the name check request from USCIS to the FBI. If such a problem is reported, the FBI name check requests will then be initiated a second time and resent manually or electronically to the FBI for a response. In this way USCIS ensures that the FBI has in fact received all requests for name checks. FBIQUERY reports do not provide USCIS with any information as to what information the FBI may have relating to a particular alien, whether an FBI investigation into the particular alien has been undertaken, or whether there are national security concerns relating to that alien.

8. Once the FBI name check request is submitted, the file is then sent to a separate "Pending Shelf" to await a response. All files on the Pending Shelf are audited regularly in order to identify those in which a response from the FBI has been received. This audit is conducted, at least, every 4 weeks. In this manner, the agency ensures that as FBI responses are received the files are properly released for adjudication. Plaintiff's file was placed on the Pending Shelf in accordance with these procedures and has been audited regularly at least every 4 weeks to determine if an FBI response has been received. This review was last done on this case on January 31, 2007, and this case will continue to be monitored for the completion of background checks.

9. Since the terrorist attacks of September 11, 2001, the need to conduct more rigorous and thorough background checks on aliens who are seeking immigration status in the United States has required procedures that sometimes result in individuals not receiving their documents and benefits as quickly as in the past. In order to ensure national security and public safety, as well as to reduce the waiting time for adjudications, USCIS is currently working with DOJ, DHS, and ICE to develop and implement improved procedures that will ensure that all of the background checks are completed and the results considered as quickly as possible. However, the public safety requires USCIS to make certain that the checks have

been done before USCIS adjudicates the N-400. Accordingly, pursuant to law and established agency policy, all required security checks must be completed prior to adjudication of the application.

10. In accordance with 8 CFR § 335.2 (b), in the absence of a "definitive response" from the FBI with regard to the name check request, the plaintiff may not be scheduled for a naturalization interview on the N-400.

11. For most applicants, USCIS can quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits. However, due both to the sheer volume of security checks USCIS conducts, and the fact that USCIS must await responses from the FBI or other relevant agencies that conduct some of the required security checks, some delays on individual applications are unavoidable and may be lengthy. Moreover, in some cases a background or security check will reveal that positive (derogatory) information on the subject alien is possessed by some agency other than USCIS without necessarily revealing the substance of that information. In such cases, USCIS works closely with the other law enforcement or intelligence agencies to obtain all available information concerning the positive result in order to properly evaluate its significance. Even where the FBI or a third agency has provided a final response, a case may still be considered pending where the response requires further investigation or review by USCIS or another agency. It is vitally important to thoroughly screen each applicant in order to resolve all concerns of a law enforcement or national security nature before determining that an individual is eligible for an immigration benefit.

12. USCIS reports the average processing times for specific applications and petitions on the USCIS website. This information reflects only average processing times on the date the information is published. The publicly announced processing times only reflect cases that are considered to be within the control of USCIS. Cases considered to be within USCIS control are defined as those which are ready to be adjudicated. Cases with pending FBI name checks are not considered to be within the control of USCUS. Average processing times fluctuate widely and will sometimes even regress for a specific time due to a number of

factors, including a reallocation of agency resources, reordering of the agency's priorities, and other reasons. Additionally, not every application will require the same level of inquiry. Some may require a more detailed level of review and or investigation by either the USCIS or other agencies for a number of reasons ranging from the alien's eligibility for the benefit sought to national security concerns. Accordingly, even when it appears that the adjudication of a particular application is outside the average processing time, this does not establish that the delay is unreasonable or even due to factors within the control of USCIS.

13. In order to address the increasing number of mandamus actions filed nationwide by aliens awaiting decisions on their petitions and applications in a consistent and fair manner, USCIS issued specific guidelines for requesting an expedited name check from the FBI. Expedited processing may be pursued in the following situations: Military Deployment Age-out cases not covered by the Child Status Protection Act and applications affected by sunset provisions such as the Diversity Visa Program; Compelling reasons provided by the requesting office such as critical medical conditions; Loss of Social Security benefits or other subsistence at the discretion of the Director. To my knowledge, Plaintiff has not requested expedited processing and has not submitted evidence establishing that any of the foregoing requirements for expedited processing are fulfilled. Moreover, U.S. Citizenship and Immigration Services (USCIS) will not routinely request that the FBI expedite a name check solely on grounds that a mandamus action has been filed.

14. Regarding this pending name-check, there are three possibilities:(1) in the very likely event that the FBI name check ultimately clears with a finding of "no record" or "NR," TSC will immediately place the application in the electronic queue to be scheduled for interview in the Miami District Office or the appropriate sub-office on the first available date and transfer the A-file to the place where the interview will be held. (2) In the less likely event that the FBI eventually reports a "positive response" or "PR," significant additional time would likely be required while USCIS learns the precise nature of the positive information and determines whether it would have any bearing on the outcome of the adjudication, and (3) as long as the

Declaration of Joyce A. Brown 5        Case No.: 07-cv-02153, District of Columbia

1    FBI query continues to return its current response of "pending" or "IP," this case will not be
2    scheduled for interview.
3    15. Currently, the Miami District Office has a total of 15,773 N-400 cases that are pending FBI
4    name checks. There are approximately 1,134 N-400 cases to be scheduled at the Miami
5    District Office that have been pending completion of background checks longer than the
6    petitioner's case.
7    16. While the naturalization application remains pending, plaintiff retains all of the rights and
8    benefits of a permanent resident of the United States, including the right to live and work in
9    this country and to travel freely abroad.
10
11    I declare under penalty of perjury that the foregoing is true and correct.
12    Executed on this 11th day of March, 2008 at Dallas, Texas.
13
14
15    Joyce A. Brown
16    Supervisory Center Adjudications Officer
    Texas Service Center
17
18
19
20
21
22
23
24
25
26
27

Declaration of Joyce A. Brown  6       Case No.: 07-cv-02153, District of Columbia

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Rola Hamandi | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: |
| | ) | 1:07-CV-02153 |
| Alberto Gonzales, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)     I am currently the Section Chief of the National Name Check Program Section ("NNCPS") at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2)     In my current capacity as Section Chief, I supervise the National Name Check Units. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am aware of the name check request for Rola Hamandi, the plaintiff in this civil action.

## NATIONAL NAME CHECK PROGRAM

(4)   The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies. The Central Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees. The FBI performs the primary National Agency Check conducted on all United States Government employees. From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)   The FBI's CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files

2

compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBI Headquarters. Records which are pertinent to specific FBI Field Offices are mostly maintained at those Field Offices.

(6)     FBI Headquarters and each Field Division can access the CRS through the FBI's General Indices. The General Indices are arranged in alphabetical order and consist of indices on various subjects, including the names of individuals and organizations. Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

(7)     Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8)     The entries in the General Indices fall into two categories:

(a)     "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

(b)     "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

(9)     In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system

consists of the following three automated applications that support case management functions

for all investigative and administrative cases:

(a) Investigative Case Management: This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads. A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed. The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation. Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

(b) Electronic Case File: This application serves as the central electronic repository for the FBI's official text-based documents. It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the computerized system. All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

(c) Universal Index: This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases. Only the Office of Origin is required to index. However, the Lead Offices may index additional information as needed. The Universal Index, which consists of an index of approximately 100.2 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases. Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

4

(10)     The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve one of the mandated missions of the FBI, to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)     When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program

5

application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)     If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked.  If a search comes up with a match to a name and either a close date of birth or social security number, it is designated an "Ident."

## RESOLUTION RATE

(13)     There are four stages involved in the completion of an individual name check: batch processing, name searching, file review, and dissemination.  The first stage in the process, batch processing, involves the transfer of the name check requests from USCIS to the NNCPS on magnetic tapes.  Each tape can hold up to 10,000 names.  (Some requests are transmitted via facsimile or verbally via telephone.)  The tapes are uploaded into an FBI system and the names are electronically checked against the FBI's Universal Index (UNI).  Historically, during the batch processing phase, approximately 68 percent of the name checks submitted by USCIS are returned to USCIS as having "No Record" within 48-72 hours.  A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual.  Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14)     The second stage in the process is name searching.  For the name check requests that are still pending after the initial electronic check, additional review is required.  An

6

FBI employee in the NNCPS physically enters the applicant's name into the computer database searching different fields and information. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS.

(15)    The third and fourth stages in the process are file review and dissemination. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(16)    Additional searches against the FBI's Universal Index, additional manual name searches, and/or additional file review of a name check request, depending on the length of time a name check request is pending in the processing queue, may occur periodically during the name check process to ensure that stale information is updated.

(17)    Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

7

(18)    At each stage of processing, the NNCPS generally works on the oldest name checks first – a first-in, first-served protocol. This protocol reflects that all applicants are equally deserving and ensures that all applicants are treated fairly. However, if an applicant's name check requires a review of numerous FBI records and files, even though that person came in first, the name check may require additional time until all responsive records are located and reviewed.

(19)    The general exception to the first-in, first-served policy exists when USCIS directs that a name check be handled on an "expedited" basis. USCIS determines which name checks are to be expedited based on criteria it determines. Once designated as an "expedite," that name check proceeds to the front of the queue along with other prioritized name check requests, in front of the others waiting to be processed.

(20)    Another exception to the first-in, first-served policy is a near-term effort agreed to by USCIS and the FBI to reduce the number of pending USCIS name check requests by prioritizing "single hit" name checks. This key initiative is explained in paragraph (33) below.

## GROWTH OF THE NAME CHECK PROGRAM

(21)    Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4 million name checks.

(22)    A significant portion of the incoming name checks submitted over the past few years has been submitted by USCIS. In fiscal year 2003, 64% (approximately 3,929,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2004, 46% (~1,727,000)

8

of the total incoming name checks were submitted by USCIS; in fiscal year 2005, 45% (~1,512,000) of the total incoming name checks were submitted by USCIS; and in fiscal year 2006, 45% (~1,633,000) of the total incoming name checks were submitted by USCIS.

## USCIS NAME CHECK REQUESTS

(23)     In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. However, because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.

(24)     In December of 2002 and January of 2003, the former INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with then-pending applications for immigrations benefits for which the Immigration and Nationality Act required background investigations. Those 2.7 million requests were in addition to the regular submissions by the former INS. Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to those resubmitted requests indicated that the FBI had no information relating to the specific

9

individual who was the subject of the request, approximately 16 percent – or over 440,000 –

resubmitted requests indicated that the FBI may have information relating to the subject of the

inquiry. The FBI is still in the process of resolving those 440,000 requests. Currently, less than

6,300 of those resubmitted requests remain pending.

(25)     The FBI's processing of the more than 440,000 residuals has delayed the

processing of regular submissions from USCIS. A dedicated team within NNCPS has been

assigned to handle only these re-submitted name check requests. To the extent that the team

members are working on only these applications, they are unavailable to process the normal

submissions.

(26)     There are numerous factors that have contributed to delays in the

processing of name check requests. One is the volume of incoming name checks – the total

volume of incoming name check requests combined with pending name check requests has

historically outpaced the NNCPS's available resources to process this volume. As it concerns

submissions by USCIS, for Fiscal Year 2006, USCIS submitted approximately 1,633,000 name

check requests, of which approximately 718,000 represented naturalization-related name checks

and approximately 658,000 represented adjustment of status-related name checks. As of the end

of Fiscal Year 2006, the NNCPS had over 364,600 pending USCIS name check requests, of

which over 157,300 represented naturalization-related name checks and over 157,800

represented adjustment of status-related name checks.

(27)     The number of "hits" on a name when it is reviewed may further

contribute to a delay in processing a name check request. A "hit" is a possible match with a

name in an FBI record.  The number of times the name appears in FBI records correlates to the number of records which require review.

  (28) The processing of common names also contributes to a delay in processing a name check request.  The names associated with a name check request are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with just the first and last, first and middle, and so on.  Without detailed information in both the file and agency submission, it is difficult to determine whether or not a person with a common name is the same person mentioned in FBI records.  Common names can often have more than 200 hits on FBI records.

  (29) The accessibility of the FBI record needed for review also contributes to a delay in processing a name check request.  If the date of the record predates October 1995, the paper record has to be located, retrieved, and reviewed; if the date of the record is later than October 1995, the record text may or may not be available electronically depending on the type of record and whether it has been uploaded electronically.  A paper record could be at one of over 265 possible locations across the country.  Requests often involve coordinating the retrieval and review of files from the various 56 different FBI field offices.  One person's name check may involve locating and reviewing numerous files, all at different physical locations.  Each request must be communicated internally from the NNCPS to the field, and handled according to the current priorities of the particular field office.  Since it is a paper based process, it is a process subject to misplaced or misfiled files.  The process is time consuming and labor intensive.

(30) Another contributing factor which was briefly mentioned earlier in this declaration is the expedited request. Processing an expedited case means that an employee is not available to work on a normal name check request.

## THE NATIONAL NAME CHECK PROGRAM IS ADDRESSING THE FACTORS THAT CONTRIBUTE TO DELAYS IN PROCESSING A NAME CHECK

(31) The FBI is seeking a number of improvements to its process. Over the short-term:

(32) NNCPS is continuing to develop the Name Check Dissemination Database ("NCDD"), an electronic repository for name check results, to eliminate manual and duplicate preparation of reports to other Agencies, and provide avenues for future automation of the name check process.

(33) NNCPS is partnering with other Agencies to provide contractors and personnel to process name checks. For example, the FBI and USCIS have implemented a key initiative to use contractor resources to prioritize the processing of "Single-Hit" USCIS Name Check requests, that is, pending name check requests that have only one FBI file potentially identified with it that needs to be reviewed in order to process the request. By applying contractor resources to process these "Single Hit" requests, the FBI may significantly reduce the pending USCIS name check workload.

(34) The FBI is in the process of hiring additional employees to fill current vacancies and has procured an employee development program to streamline the training of new employees, thereby significantly decreasing the amount of time needed before a new employee

can begin to significantly impact the NNCPS workload. These efforts have led to the development of a name check employee training manual.

(35)   NNCPS, through the Records Management Division's Records Automation Section, is scanning the paper files required for review in order to provide machine readable documents for the Dissemination Database. It is also building an Electronic Records System that allows for future automation of the name check process.

(36)   NNCPS is working with customers to streamline incoming product and to automate exchange of information.

(37)   As a mid-term improvement, NNCPS is exploring technology updates to the name check process. Specifically, the FBI procured textual analysis software in order to investigate ways to further automate the name check process. The goal is to incorporate analytical software applications that reduce the time spent to verify the identity of the individual and, once verified, assists in the adjudication analysis. This type of automation should decrease the time required to process a name check, thereby increasing production. The FBI is building a proof of concept system for eventual integration into the FBI's core databases.

(38)   As a long-term improvement, the FBI is developing a Central Records Complex that will create a central repository of records. Currently, paper files/information must be retrieved from over 265 locations throughout the FBI. The Central Records Complex will address this issue, creating a central repository-scanning of documents, and expediting access to information contained in billions of documents that are currently manually accessed in locations around the United States and world. In addition, the essential long term improvement for FBI Name Checks is to adjust the fee schedule to reflect the actual cost of providing name check

13

services. Once in place, the FBI will be able to scale resources proportionally with workload

demands – pending name checks will pay for themselves. At this time fees do not cover the

basic costs of providing the service. Therefore, the FBI cannot adequately apply resources to

processing name checks without pulling critically needed personnel and funding from other

programs. The FBI procured services to conduct a study to determine an appropriate fee

structure. The independent contractor hired to conduct the study has completed its work and the

proposed fee structure is undergoing the Federal rulemaking process.

(39)    For the reasons stated earlier, the FBI cannot provide a specific or general

time frame for completing any particular name check submitted by USCIS. The processing of

name checks, including those which are expedited at the request of USCIS, depends upon a

number of factors, including where in the processing queue the name check lies; the workload of

the analyst processing the name check; the volume of expedited name checks the analyst must

process for, among others, military deployment, "age-outs," sunset provisions such as Diversity

Visa cases, compelling reasons such as critical medical conditions, and loss of Social Security or

other subsistence; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed

and resolved; the number of records from various Field Offices that must be retrieved, reviewed

and resolved; and, more generally, the staff and resources available to conduct the checks.

Unfortunately, the proprietary software NNCPS utilizes to process name checks does not report

where in the processing queue a particular name check request may lie vis-à-vis other name

checks. Additionally, until review of each case is undertaken no estimate for the time required to

complete it can even be attempted, no estimate can be made as to when the plaintiffs' cases will

be reached by NNCPS staff, nor can any reliable estimate be made as to how long it will take to

14

complete the review once it has begun. While the FBI is sensitive to the impact of the delays in

processing name check requests, the consequence of the FBI's mission on homeland security

requires that its name check process be primarily focused on providing accurate and thorough

results. When the name check is completed, the FBI provides the results to USCIS as quickly as

possible.

(40)    It is important to note that the FBI does not adjudicate applications for

benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a

summary of available information to USCIS for its adjudication process.

## PLAINTIFFS' NAME CHECK REQUEST

(41)    The name check request for plaintiff Rola Hamandi was received by the

FBI from USCIS on or about August 14, 2006 and has not been completed. The FBI is

performing its check in response to USCIS's request in accordance with the procedures outlined

above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due

course, in accordance with the FBI's normal protocol.

(42)    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

foregoing is true and correct to the best of my knowledge and belief.

Executed this ___ day of February 2008.


MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

15